**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Actava TV, Inc., | ) |
| Plaintiff, | ) Index No.:  1:21-cv-3027 |
| -against- | ) |
| Matvil Corporation d/b/a/ eTVnet, | ) **COMPLAINT AND** |
| Defendant. | ) **DEMAND FOR JURY TRIAL** |

Plaintiff Actava TV, Inc. ("Actava"), by way of its undersigned attorneys, as and for its Complaint against Defendant Matvil Corporation d/b/a/ eTVnet ("Matvil"), hereby alleges:

## PRELIMINARY STATEMENT

1.     From 2016 until 2018, Actava and Matvil had a written contract (the "Referral Agreement") under which Actava introduced prospective customers to Matvil's online streaming media service, and provided goods and services to them, thereby generating subscription revenue to Matvil, which Matvil was contractually bound to share with Actava.

2.     Despite its clear obligations under the Referral Agreement, Matvil improperly terminated the Referral Agreement and failed to pay a contractually-required Break-up Fee.

3.     Plaintiff seeks damages for Defendant's failure to pay the Break-up Fee, and for Defendant's ongoing failure to compensate Plaintiff for revenues derived from customers referred by Plaintiff.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this controversy is between citizens of a state and citizens of a foreign state and the amount in controversy exceeds $75,000.

5.      Defendant is subject to personal jurisdiction in the Southern District of New York ("SDNY") because Defendant: (1) entered a contract with Plaintiff within this jurisdiction; (2) agreed for SDNY to have jurisdiction under that contract; (3) committed a breach outside and within this jurisdiction, and; (4) thereby caused damages within the jurisdiction, making long arm jurisdiction appropriate under New York law.

6.      SDNY is the proper venue for this action because: (1) Defendant entered into a contract with Plaintiff within this jurisdiction and Defendant agreed for SDNY to be an appropriate venue under that contract, and; (2) it is otherwise proper in this District pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## PARTIES

### *Plaintiff*

7.      Plaintiff Actava TV, Inc. is a for-profit domestic business incorporated and organized under the laws of the State of Delaware with a principal place of business located in New York.

8.      During the period relevant to this action, Actava was a set-top box provider, website operator and a marketing and sales company in the internet protocol television ("IPTV") industry.

9.      Using its extensive know-how and expertise in the IPTV industry and its customer base, Actava marketed to US-based (primarily East Coast) customers seeking access to Russian-language television content.

2

10.    Beginning in September of 2016, Actava derived revenue from marketing Defendant Matvil's IPTV services and referring subscribers or customers to Matvil.

11.    Actava also provided customer service and technical support to those customers who subscribed to Defendant Matvil's services to assist its customers access the content that Defendant streamed.

### *Defendant*

12.    Defendant Matvil Corporation d/b/a/ eTVnet is a corporation incorporated and organized under the laws of the Province of Ontario, Canada.

13.    Defendant's principal place of business is located at 312 Dolomite Drive Suite 215, Toronto Ontario M3J2N2, Canada. Upon information and belief, its current Chief Executive Officer is Mykola Skrynnyk.

14.    Upon information and belief, its majority owners are Vladimir Zaykin and Mikhail Gayster, together with Gayster's family.

15.    Defendant Matvil is an IPTV company that sells and streams television content to customers primarily in the United States as well as in Canada.

16.    As an IPTV company, Matvil uses a computer system of geographically distributed servers known as a Content Delivery Network ("CDN").  The CDN permits Matvil to deliver computerized streams of data (*i.e.*, television content) to its subscribers.

17.    Defendant Matvil's subscribers access Matvil's streaming services through their TV sets via a set-top box, smart televisions and/or computers.

18.    Upon information and belief, Defendant Matvil has license agreements with various Russian television channels (the "Channels") that permit Matvil to re-transmit or stream the Channels' original television content to Matvil's subscribers.

## STATEMENT OF FACTS

### *Parties' Business Arrangement under Referral Agreement*

19.     On September 8, 2016, Plaintiff Actava and Defendant Matvil entered a "Referral Agreement" (a redacted version of which is attached as Exhibit A, omitting the confidential terms thereof).

20.     At that time, Actava possessed capabilities and expertise in the areas of marketing, advertising, customer support, technical support, and sales in the IPTV industry.

21.     Further, in the Northeast United States, Actava possessed business characteristics that Defendant Matvil lacked: brand-recognition, goodwill, and business contacts.  In particular, Actava was able to provide turnkey solutions to customers seeking to access Russian television services, i.e., set-top boxes ready to use for IPTV services.  Actava had expertise in obtaining set-top boxes wholesale, configuring them, and re-selling configured set-top boxes.  Actava also provided customers with the technical and customer support necessary upon installation of set-top boxes and throughout their subscription period.  At the time the Referral Agreement was executed, Matvil did not sell pre-loaded set-top boxes.  Nor did Matvil have Actava's expertise.

22.     Actava was able to market Defendant Matvil's IPTV services to Actava's prior customers who were waiting for Actava to provide turnkey solutions, as well as to new audiences.  Actava was well positioned to use its marketing expertise to enlist new customers to Matvil's IPTV services.

23.     Pursuant to the Referral Agreement, Actava pre-loaded Matvil's application software onto set-top boxes.

24.     Defendant Matvil's application provided a connection to its CDN enabling its subscribers to view IPTV content that Matvil streamed.

25.     In recognition of their complementary capabilities, the parties implemented the Referral Agreement's business arrangement and operated thereunder from the beginning of September of 2016 until the events complained of herein in August 2018.

26.     Specifically, under the Referral Agreement, Section 1.a., Defendant Matvil was obligated to:

    i.   provide "the following services to the customers [that Plaintiff referred]: real-time broadcasting as well as video on demand broadcasting of channels, to the customers;"

    ii.   "bill the customers and collect payments from customers" that Plaintiff referred, and;

    iii.   "provide special tariffs (i.e., sales) to" Plaintiff.

27.     Specifically, under the Referral Agreement, Section 1.a., Plaintiff Actava had the following "Actava Obligations" to:

    i.   "serve as a source of referrals" for Defendant Matvil;

    ii.   "diligently promote Matvil's Service Offerings" (defined as both real-time and on-demand broadcasting;

    iii.   "sign up" and "register customers" to Matvil's services; and

    iv.   "provide customer support and technical support related to set-top boxes".

28.     Actava and Matvil agreed to share monthly revenue derived from each customer or subscriber that Actava referred pursuant to a formula designated in the Addendum to the Referral Agreement (the "Formula").

29.     Under the Referral Agreement, Actava is entitled to a "Revenue Share" under the Formula with respect to a subscriber it referred so long as that subscriber remains subscribed to Matvil, unless Matvil validly terminated the agreement for material breach.

30.     Upon information and belief, customers that Actava referred to Matvil have paid and continue to pay subscription fees directly to Defendant Matvil.

***Defendant's Ineffective Termination and Breach of Referral Agreement***

31.     From September of 2016 through August 16, 2018, Matvil paid Revenue Shares to Actava in accordance with the Formula.

32.     However, since making its last payment on or about August 16, 2018, Matvil ceased paying Actava the Revenue Shares.

33.     Matvil attempted to claim that Actava was in breach of the Referral Agreement, and sent Actava a "Breach Notice" dated August 2, 2018.

34.     The Breach Notice failed to state any provision of the Referral Agreement that Actava had allegedly breached, instead complaining that on July 23, 2018, Actava had commenced a lawsuit against third parties, *Actava TV Inc. et al v. Joint Stock Company "Channel One Russia Worldwide" et al* bearing docket number 1: 18-cv-06626.

35.     Section 2.b. of the Referral Agreement indicates as follows:

"<u>Termination</u>. The Parties may terminate this Agreement subject to the following conditions.

    i.    In the event that Broadcaster is in breach of Section (1)(f)(i)-(ii), such breach shall be considered material, and Marketer shall be entitled to terminate this Agreement immediately upon written notice to Broadcaster.

    ii.    With the exception of a breach by Broadcaster of Section (1)(f)(i)-(ii), in the event of a suspected breach the non-breaching Party shall provide the breaching Party with written notice of such suspected breach. In the event that the breaching Party fails to cure the suspected breach within ten (10) days, the non-breaching Party may terminate the Agreement.

    iii.    Broadcaster may terminate this Agreement upon ten (10) days written notice of the death or physical or mental incapacity of any of Marketer's key person(s) performing the Services on the Broadcaster's behalf, and as a result of which, the Marketer becomes unable to continue the proper performance of the Services.

    iv.    Either Party may terminate this Agreement upon ten (10) days written notice of an act of gross negligence or willful misconduct committed by the breaching Party.

    v.    In the event of the insolvency, liquidation, or bankruptcy of a Party, the surviving Party may terminate this Agreement upon ten (10) days written notice."

(Emphasis added.)

36.     None of the foregoing termination conditions (*e.g.*, mental incapacity or insolvency) occurred or claimed to have been occurred.

37.     Actava's exercise of its right to litigate against a third party was not an "act of gross negligence or willful misconduct."

38.     Therefore, Matvil could not exercise the Referral Agreement's Termination Provision under Section 2.b.

39.     As a result, Actava sent an invoice and a demand letter, dated October 25, 2018 treating Matvil's purported termination as a Cancellation under the Referral Agreement, and demanding a "Break-up Fee" pursuant to the Cancellation Provision.

40.     Section 2.d. of the Referral Agreement indicates as follows:

"Cancellation. This Agreement may be canceled by either Party by giving (90) calendar days written notice of such cancellation to the other Party.
 . . .

        ii.     In case of cancellation by the Broadcaster, Marketer may elect, at its option, to 1) retain all customers that it has referred and have no obligation for the payment of additional fees; or 2) to receive a break-up fee from Broadcaster that shall equal sixteen (16) months of fees as calculated by section (e) of the Addendum to this Agreement for each customer the Marketer has signed up who is actively using services on the date the cancellation is effective.  If, in the event of cancellation by Broadcaster, Marketer elects to retain the customers, Broadcaster shall use all best efforts to assist Marketer in transitioning its retained customers to another content provider.

41.     Matvil refused to pay the Break-up Fee demanded by Actava.

42.     Upon information and belief, the customers who were signed up by Actava continued to pay subscription fees to Matvil.

43.     Matvil failed to respond or to pay Revenue Shares to Actava with respect to the customers referred to, and kept by, Matvil from August 16, 2018 to the present.

44.     Matvil has repeatedly ignored Actava's statements of account.

45.     Most recently, Actava sent a demand dated March 10, 2021 for the Break-up Fee pursuant to the Cancellation Clause, as well as a separate restated demand, also dated March 10, 2021, for the Revenue Shares that have accrued since August 16, 2018.

46.     Matvil's breaches of the Referral Agreement proximately damaged Plaintiff in an amount to be determined at trial, believed to be not less than $1,000,000.

## JURY DEMAND

Plaintiff demands trial by jury of all claims herein.

## FIRST CAUSE OF ACTION

### *(Breach of Contract)*

47.     Plaintiff hereby re-alleges each allegation of the foregoing paragraphs as if fully set forth herein.

48.     On or about September 8, 2016, Plaintiff and Defendant executed a Referral Agreement.

49.     Plaintiff performed its duties under the Referral Agreement.

50.     On or about August 2, 2018, Defendant improperly purported to terminate the Referral Agreement without paying Plaintiff a Break-up Fee.

51.      This breach of contract caused Actava damages in the amount of the Break-up Fee plus pre-judgment interest, in an amount to be determined at trial, believed to be not less than $650,000, together with reasonable attorneys' fees and any other such relief as the Court deems just, proper, and equitable.

## SECOND CAUSE OF ACTION

### *(Unjust Enrichment)*

52.     Plaintiff hereby re-alleges each allegation of the foregoing paragraphs as if fully set forth herein.

53.     Matvil benefitted by deriving revenues from customers referred by Actava, from August 16, 2018 to the present, without compensating Actava for the same.

54.     It is against equity and good conscience to permit Matvil to derive revenues from those customers, from August 16, 2018 to the present, without compensating Actava for the same.

55.     This unjust enrichment caused Actava damages in an amount to be determined at trial, believed to be not less than $350,000, to which Plaintiff is entitled to through March 2021, together with reasonable attorneys' fees and any other such relief as the Court deems just, proper, and equitable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to enter a judgment in Plaintiff's favor and against Defendant as follows:

A.     Awarding Plaintiff monetary damages on the First and Second Claims for Relief in the total amount to be determined at trial, believed to be not less than $1,000,000, including prejudgment interest, together with reasonable attorneys' fees and any other such relief as the Court deems just, proper, and equitable;

B.     An award to the Plaintiffs of punitive damages in the amount of $3,000,000; and

C.     An award of any such other relief as the Court deems just, proper, and equitable.

Dated: New York, New York
      April 8, 2021

                    Respectfully submitted,

                    MOSES & SINGER LLP

                By: /s/ Toby Butterfield
                    Toby Butterfield
                    Michael Rosenberg
                    405 Lexington Avenue
                    New York, NY  10174
                    Telephone: (212) 554-7800
                    Facsimile: (212) 554-7700

                    *Attorneys for Plaintiff*